**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MONTY C. PEPPER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-084-JJF |
| | ) | |
| Warden THOMAS CARROLL, C/O | ) | |
| BAMBI THOMAS, C/O JAMES | ) | |
| GARDELS, C/O THOMAS SEACORD | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION TO DISMISS/SUMMARY JUDGMENT**

**I.      Introduction**

Plaintiff makes many wide-ranging allegations in this case in which it appears that he is accusing Defendants of violating the Eighth Amendment by inflicting cruel an unusual punishment on him.  According to Plaintiff, the cruel and unusual punishment claims vary from access to attorney phone calls to the prices charged in the commissary, along with a number of other complaints.

Defendants refer to matters outside the pleadings, therefore the Court may treat its motion to dismiss as one for summary judgment.  *See* Fed. R. Civ. P. 12(b)(6);  *Camp v. Brennan*, 219 F.3d 279, 280 (3rd. Cir. 2000) (consideration of matters beyond the complaint converts a motion to dismiss into a motion for summary judgment).   Defendants Thomas Carroll, Bambi Thomas, James Gardels and Thomas Seacord contend that they are entitled to judgment as a matter of law because there are no genuine issues of material fact in dispute.  *See Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (once the moving party has carried its initial burden, the nonmoving party "must come forward with 'specific facts showing that there

is a genuine issue for trial.'"). Defendants assert that Plaintiff has not made, and cannot make a

sufficient showing of the essential elements of his case for which he carries the burden of proof.

Therefore, dismissal is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In

addition, Defendants contend that unless there is sufficient evidence to enable a jury reasonably

to find for the nonmoving party on the factual issue, summary judgment should be granted. *See*

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).

## II.    Statement of Facts

Plaintiff is an inmate housed at the Delaware Correctional Center (hereinafter "DCC").

He starts his Complaint by first alleging that he has been unable to make "legal calls" from "Oct

14 04 [sic] up until [sic] Nov 17 04 [sic]". (*See* Complaint, Statement of Claim). Plaintiff

claims in his Statement of Claim that he tried numerous times to request calls to an attorney.

When an inmate wishes to speak to an attorney, he writes the request on a piece of paper

and gives it to a correction officer. The officer then tries to contact the attorney to set up a time

for the inmate and lawyer to speak together. If a telephone appointment time is arranged, then an

officer will call the attorney at the appointed time after bringing the inmate to the room where he

can speak to his lawyer in private. (*See* Affidavit of Lt. Thomas Seacord, attached as Exhibit

"A").

In Plaintiff's case, when he requested phone calls to an attorney in the autumn of 2004,

an officer tried to contact the attorney. The officer was told that the attorney was in trial and too

busy to speak to Plaintiff. (*See* Affidavit of Sgt. Bambi Thomas attached as Exhibit "B").

Subsequent to the call, the attorney filed a motion to withdraw as Plaintiff's attorney. (*See*

Superior Court Docket attached as Exhibit "C"). When Officer Thomas next attempted to

arrange an appointment for Plaintiff to speak wit the attorney she was told that the attorney filed

a motion to withdraw from Plaintiff's case. (Exhibit B). During the same time period, Plaintiff requested a call to the Public Defender's Office. (Exhibit A). The Public Defender's Office refused the call stating that Plaintiff was not a client. The law librarian for the Security Housing Unit (hereinafter "SHU"), Brian Engram, was asked to look into the matter. He sent a memo to Plaintiff explaining that Plaintiff's attorney was withdrawing from his case. (*See* Memo dated January 18, 2005, attached as Exhibit "D"). When an attorney refuses to speak to an inmate, there is little the correction officer can do other than tell the inmate the result of his attempts to make contact. (*See* Inmate Reference Manual, Telephone Access, and DCC policy 3.4, p. 4, regarding inmate calls to attorneys, attached as Exhibit "E").

Plaintiff claims that he was not allowed to have a request form for legal phone calls. (Exhibits A and B.) However, inmates are asked to write their request on a piece of paper and give it to the correction officer. In fact, Plaintiff states in his Complaint that he was told to write his request for a legal call on a piece of paper and give it to the correction officers. (Statement of Claim, #1). The forms referred to in the policy are the forms inmates must fill out with the list of phone numbers they designate for the telephone computer system. (See "A" and "E").

Plaintiff's next allegation concerns what he perceives as a lack of response to the grievances he filed, and denial of grievance forms. Between September 22, 2004 and February 14, 2005, Plaintiff filed six grievances. He received responses to all of them. With regard to the missing headphones, Plaintiff has been reimbursed by the business office at DCC. (*See* Account Statement attached as Exhibit "F"). Some of Plaintiff's grievances did not fall within the scope of the grievance policy, and the grievance about the razor was answered with a reminder about the housing rules in the Security Housing Unit (hereinafter "SHU"). (*See* Grievance Reports attached as Exhibit "G"). In all but one instance, the grievance reports were generated from

Plaintiff's handwritten grievances, submitted on the standard grievance forms. (*See* handwritten grievance forms attached as Exhibit "H"). The grievance dated January 29, 2005, and written on plain paper, also was accepted and received a response. (Exhibit G, grievance # 11222).

Plaintiff then moves on to a rather long list of privileges he believes he was denied, or punishments he believes were imposed without any infractions of the rules. Plaintiff provides only a few dates for these complaints, but it appears that his complaints stem from the time he was in Protective Custody in the SHU from September 18, 2004 to August 2, 2005. Plaintiff requested protective custody on September 18, 2004 because he was being threatened with harm by two other inmates. (*See* Incident report # 1015722 attached as Exhibit "I"). In the SHU the inmates' privileges are restricted. Some of Plaintiff's complaints concern those housing restrictions. For example, Plaintiff complains about not being allowed to have a razor. (See SHU housing Rules regarding razors, attached as Exhibit "J"). However, as the grievance response makes clear, the housing rules in SHU allow for distribution of razors twice a week. (See Grievance # 11282 attached as Exhibit "K"). Plaintiff, who entered DCC with a history of depression, complains that the lack of "TVs Visits and Telephone calls games etc commissary and reading Material has affected my mental condition [sic]". (Statement of Claim, # 14, and *See* Mental Health Evaluation attached as Exhibit "L"). Plaintiff goes on to say "The lack of privileges endangers my sanity." (Statement of Claim, # 14).

Plaintiff alleges that he has a "Fear of guards". (Statement of Claim, # 16). Plaintiff then goes on to discuss other inmates. (Statement of Claim, # 16). He states "This intimidation [sic] Keeps inmates and me from doing what I am doing…" However, Plaintiff does not say exactly what it is he and others were doing, or how exactly *he* was being intimidated, other than references to being "attacked."

Plaintiff alleges that he was so restricted in his use of the law library that he was not able to obtain information in order to proceed with his cases.  He also claims "copies are 250 each." (Statement of Claim, # 17).   It is not clear what he means.  The law library at DCC does not charge inmates for copies. (*See* Affidavit of Brian Engram attached as Exhibit "M", ¶3). Inmates have not been charged for copies since December 1, 2003.  Between November 29, 2004 and February 9, 2005, a time span of a little over two months, the library log shows that Plaintiff accessed the law library twenty three times.  (*See* Law Library usage log attached as Exhibit "N").  After leaving the SHU on August 2, 2005, Plaintiff had eighteen appointments at the law library between August 19, 2005 and November 4, 2005, a time span of approximately two and a half months.  Of those appointments he was a "no show" four times.  (*See* Library Appointment Schedule attached as Exhibit "O").

Plaintiff also claims that reading material is restricted and the commissary charges too much for products. (Statement of Claim, # 18 and #19).  It appears from his Complaint that Plaintiff is referring to the reading materials allowed in the SHU.  The housing rules of the DCC do restrict reading material.  (*See* Housing Rules, Personal Items, attached as Exhibit "P"). Inmates are allowed to have reading material in their cells in the SHU.  If the inmate wishes to purchase reading materials he is allowed, within the parameters of the housing rules.  (Exhibit P). Plaintiff alleges that his reading material is censored.  The housing rules do prohibit pornographic materials.  Plaintiff does not state how he believes his choice of reading materials was censored.

Finally, Plaintiff alleges that he has a "Fear of guards".  (Statement of Claim, # 16).  It appears that Plaintiff is attempting to allege retaliation. A review of the records shows only two incident reports in the months after he filed this lawsuit.  The incidents occurred approximately

two months apart and involved shakedowns of his cell. (*See* Incident Reports attached as Exhibit "Q").

## **ARUGMENT**

**I.    PLAINTIFF FAILS TO MAKE A CLAIM PURSUANT TO THE EIGHTH AMENDEMENT FOR WHICH RELIEF CAN BE GRANTED.**

Plaintiff's Complaint does not establish or support his allegations that he was deprived of a constitutional right by Defendants. In order to prevail in his Section 1983 claim, Plaintiff must demonstrate that the prison officials, acting under the color of state law, deprived him of a constitutional right. *See* 42 *U.S.C.* § 1983. In late 2004, the time period from which most of Plaintiff's allegations spring, the defendants were prison officials at the DCC, a state facility. Defendants contend that they did not violate Plaintiff's constitutional rights under the Eight Amendment by subjecting him to cruel and unusual punishment.

Plaintiff fails to demonstrate that Defendants were deliberately indifferent to his needs while in the SHU. In Wilson v. Seiter, 501 U.S. 294 (1991), the Supreme Court addressed the intent requirement in an Eighth Amendment conditions of confinement case. The Court concluded that to be found liable for inflicting cruel and unusual punishment on an inmate or inmates, the prison officials who inflicted that punishment must be proven to have been deliberately indifferent towards those conditions and their effects on the plaintiffs. Wilson, 501 U.S. at 303. Even if they were proven to have been negligent, that showing would not suffice. Id. at 305. The Third Circuit Court of Appeals has also recognized the need for plaintiffs to make such a showing in a conditions of confinement case. Tillman v. Lebanon County Correctional Facility, 221 F.3d 410, 418 (3d Cir. 2000). Court held that "To demonstrate a deprivation of his basic human needs, a plaintiff must show a sufficiently serious objective deprivation, and that a prison official subjectively acted with a sufficiently culpable state of

mind, i.e., deliberate indifference." *Id.* The Court went on to state that "[W]hen the government takes a person into custody against his or her will, it assumes responsibility for satisfying basic human needs such as food, clothing, shelter, medical care and reasonable safety." *Id.*

Plaintiff fails to demonstrate that the conditions of his confinement deprived him of any basic necessities while he was in protective custody, housing that Plaintiff himself requested. Further, Plaintiff fails to show that the deprivations he claims he suffered were sufficiently serious, or that any of the defendants acted with deliberate indifference.[1]

> **A.    Plaintiff's allegation that he was being punished by the restrictive environment in SHU does not state a claim for violation of the Eighth Amendment.**

Housing in Protective Custody in the SHU does not deny Plaintiff any basic human needs. Plaintiff's own Complaint actually establishes that far from being indifferent to his basic needs, his request to transfer to Protective Custody was quickly honored, thus establishing that Defendants were attuned to his basic human need for safety. Plaintiff voluntarily placed himself in the SHU after asking for Protective Custody on September 18, 2004. (Exhibit I).[2] Plaintiff provides a long list of what he claims are punishments in his Complaint. He is referring to the restrictions imposed by the SHU housing rules. The Third Circuit Court of Appeals held that simply stating the rules of the SHU or administrative custody unit is not evidence of that an inmate was denied basic human needs. *Griffin v. Vaughn*, 112 F.3d 703, 708 (3rd Cir. 1997). Further, as the Federal District Court in Pennsylvania pointed out in a similar case, there is "no legal merit to Plaintiff's tacit claim that he has a constitutional right to be placed voluntarily into administrative custody, while at the same time enjoy special privileges unavailable to any other

---

[1] Using a "shotgun approach", Plaintiff asserts nearly every possible "conditions of confinement" claim available. Plaintiff's vague allegations are inadequate to state a claim as a matter of law.
[2] Plaintiff also appears to compare himself to pre-trial detainees in some of his claims, such as "Denial of 2 visits a week in minimum [sic] security building [sic] like pre trial inmates." (*See* Statement of Claim, item # 4, section 3). Plaintiff accepted a guilty plea on August 16, 2004, approximately one month before requesting protective custody.

prisoner similarly situated." *Daniel v. Chesney*, C.A. No. 1:CV-04-300, 2005 WL 2674543, at *3 (M.D. Pa. October 20, 2005). Plaintiff is in much the same situation as the plaintiff in *Daniel*, who also asked to be placed in protective custody.

The SHU at DCC is a highly regulated and restrictive housing unit. The rules are in place to control the behavior of those who are unable to abide by the rules in the other housing units, and to protect inmates who are vulnerable. A violation of the Eighth Amendment occurs when actions taken by prison officials or rules are "'totally without penological justification.'" *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)(citing *Gregg v. Georgia*, 428 U.S. 153, 183 (1976). The Court in *Rhodes* found that "the Constitution does not mandate comfortable prisons." What is required, and what is provided in the SHU at DCC, is attention to an inmate's basic human needs for food, clothing, shelter, sanitation, medical care and safety.

i.     **Pursuant to *Turner*, the SHU inmate housing rules are reasonably related to legitimate penological interests**.

Plaintiff alleges that the SHU housing rules are a violation of his Eighth Amendment right against cruel and unusual punishment. Prison regulations which limit inmates' access and activity are constitutional if the regulation is reasonably related to a legitimate penological interest. *Turner v. Safley*, 482 U.S. 78, 79 (1987). "[T]he burden is not on the state to prove the validity of the challenged prison regulation but instead is on the inmate to disprove it." Overton v. Bazzetta, 539 U.S. 126, 132 (2003). "[W]here 'other avenues' remain available for the exercise of the asserted right...courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials ... in gauging the validity of the regulations.'" DeHart v. Horn, 227 F.3d 47, 53 (3d Cir. 2000)(*quoting Turner*, 482 U.S. at 90)). The relevant inquiry is "whether an inmate has alternative means of practicing his or her religion generally, not whether an inmate has alternative means of engaging in the particular practice in question." *Id.* at 55.

"[S]ecurity, and budget constraints are legitimate penological interests." <u>Williams v. Morton</u>, 343 F.3d 212, 217 (3d. Cir.2003). *See* <u>Fraise v. Terhune</u>, 283 F.3d 506, 517-18 (3d Cir. 2002) (finding security to be a legitimate penological interest).

The housing rules in the SHU are rationally related to the legitimate penological interest of prison security. The SHU housing rules serve the purpose of keeping a large number of inmates who have failed to behave appropriately in the general prison population, in secure housing for the safety of other inmates and staff. The SHU is also the place where those requiring protective custody have access to the most secure housing the prison can offer. Plaintiff had the ability to leave the SHU protective custody if he found it intolerably restrictive. Plaintiff admits that he was offered that option when he complained about the rules. (Statement of Claim). Plaintiff has failed to demonstrate how the SHU housing rules are not related to a legitimate penological interest, and thus violate the Eighth Amendment.

Plaintiff does not complain that he was denied the basic human necessities, but rather generally complains of the lack of recreational opportunities and access to the commissary. Plaintiff complains that he was denied access to various recreational choices such as television, games, and reading material, among other things. However, accommodations are made for inmates to participate in religious services, and they have access to reading materials. Plaintiff was limited in the amount of reading materials he can have in his cell *at any given time* while in the SHU. What Plaintiff fails to say is that he had the option of turning in books and newspapers he was finished reading, which would have allowed him to replenish his supply of reading materials. The choice of whether he rotated his reading materials was his. Further, limitations on his ability to access the commissary did not work to deny Plaintiff access to the necessities of life.

With regard to the housing rules, Plaintiff refers to unequal treatment by order of the warden. (Statement of Claim, # 12).   However, this allegation contradicts his earlier claims in the Complaint, specifically, that he was treated the same as the other inmates in SHU, or, as he says, "Punishment without Breaking any Rules."  (Statement of Claim, #4).  Plaintiff provides no support for his vague allegation of unequal treatment by Defendant Carroll.   He also alleges he has letters that he wrote to various officials.  Plaintiff  does not provide any copies of the correspondence, nor does he show how the purported correspondence establishes deliberate indifference to basic human necessities, or even unequal treatment by Defendant Carroll.

The crux of Plaintiff's allegations is that he wanted the security of the SHU without having to following the rules of the SHU.  His expectation of special privileges in the SHU environment does not comport with the legitimate penological interest of maintaining the high level of security required for the safety of inmates and staff.

**B.     Plaintiff's allegations that his grievances did not receive responses and that he was denied grievance forms do not form the basis for an Eighth Amendment violation.**

Plaintiff's handwritten grievance forms, along with the grievance reports showing the response to his grievances, are  evidence that Plaintiff has not been foreclosed from participation in the grievance process, as he seems to allege.  (Exhibits G and H).   The fact that Plaintiff's grievances did not receive the response *he* desired does not create Eighth Amendment liability for Defendants.   Filing a grievance does not mean that prison officials must automatically acquiesce to Plaintiff's demands.   From the allegations in his Complaint, Plaintiff appears to believe that each time he did not get the results he expected from his grievances, it established a claim for cruel and unusual punishment.   However, Plaintiff fails to demonstrate that the issues in his grievances created a denial of a basic human need, and that Defendants were deliberately

indifferent to a serious deprivation of his needs.  <u>Tillman v. Lebanon County Correctional</u> <u>Facility</u>, 221 F.3d 410, 418 (3d Cir. 2000).

Plaintiff's grievances do not provide the basis for a claim of cruel and unusual punishment.  A review of the grievances filed by Plaintiff reveal that he complained about his missing headphones, not being allowed a razor on a day when razors are not distributed in the SHU, a verbal altercation with a correction officer, and not being able to receive legal calls. None of the grievances reaches the level of deliberate indifference to a serious deprivation of a basic human need by Defendants.  In addition, reports of the results of Plaintiff's grievances demonstrate that he does receive responses.  The reports show that Plaintiff frequently makes demands for remedies that cannot be granted, such as 'This is being sent to governers [sic] office I expect charges to be pressed" (Exhibit G - Grievance # 11501).  Plaintiff did file a grievance regarding missing headphones.  He was reimbursed by the business office for the headphones in the amount of $20.20. (Exhibit F).  That Plaintiff does not get the response he demands in his grievances does create a claim for deliberate indifference on the part of Defendants.

### i.    Plaintiff's claims of verbal abuse do not rise to the level of an Eighth Amendment violation.

Plaintiff makes allegations that he was verbally abused on several occasions by Defendants.  Plaintiff complained about comments made by a correction officer in a grievance. (Exhibit G, grievance #11222).  Plaintiff also alleges that he was verbally abused when asking for a razor, and was told he could not have one. (Statement of Claim, Verbal Abuse). "However, acts or omissions resulting in an inmate being subjected to nothing more than threats and verbal taunts do not violate the Eighth Amendment."  *McBride v. Deer*, 240 F.3d 1287, 1291 (10th Cir. 2001).  In his grievance Plaintiff says nothing about Officer Terry doing anything more than

making a remark to him about cruel and usual punishment.[3]  Nor does Plaintiff make allegations in his Complaint about any actions by correction officers that amount to more than taunts.  In addition, being told "No" in response to a request is not verbal abuse.  Therefore, Plaintiff's allegations about verbal abuse do not make out a claim for cruel and unusual punishment.

## II.    PLAINTIFF'S LEGAL ACCESS CLAIM MUST FAIL BECAUSE HE ADMITS THAT HE SUFFERED NO ACTUAL INJURY.

Plaintiff's allegations that he was denied access to legal phone calls, and denied access to the law library are without merit. Plaintiff does not allege any actual injury resulting from the purported denials.

Prison inmates have a constitutional right to access the courts under the First Amendment. *Bounds v. Smith,* 430 U.S. 817, 824-25 (1977).  To state a cognizable claim for violation of the right to access to the courts, a prisoner must allege and offer proof that he suffered an "actual injury" as a result of the denial. *Oliver v. Fauver,* 118 F.3d 175, 177-78 (3d Cir. 1997). The United States Supreme Court has defined actual injury in the access to courts context as the loss or rejection of a nonfrivolous legal claim regarding sentencing or the conditions of confinement. *See Lewis v. Casey,* 518 U.S. 343, 351 (1996).

Here, Plaintiff submits only his dissatisfaction with the legal access policies and practices at DCC.  Plaintiff does not allege that he was ever prevented from timely filing a claim or defense, blocked from meeting a statute of limitation, or unable to meet a court-imposed deadline as a result of these policies.  An examination of Plaintiff's actual law library use and the circumstances surrounding his legal phone calls in the autumn of 2004, demonstrate that neither the policies of the institution, nor the actions of Defendants caused him an injury with regard to his court cases.

---

[3] A note on grievance # 11222 states that Correction Officer Terry apologized for his remarks.

Plaintiff discusses his allegations regarding the procedure for accessing legal phone calls. Plaintiff even admits that he was told to write his request on a piece of paper and submit it. (Statement of Claim, #1).  Writing the request on a piece of paper and submitting it to officers is how the requests for legal phone calls are handled at DCC.  (Exhibits A & B).  Plaintiff's requested calls were not accepted by either the attorney or the Public Defender's Office.  The fact that attorneys did not wish to speak to Plaintiff does not create liability for Defendants for denial of access to the courts. Defendants did what they could to help Plaintiff contact a lawyer. They cannot force an attorney to speak to Plaintiff. Although Plaintiff complains about the procedure for access to legal calls, he does not allege or demonstrate that this procedure caused him actual injury.  Plaintiff even admits that "I was told my attorney didn't want to talk to me." (Statement of Claim).   He was also sent a memo by the law library paralegal who looked into issues regarding calls to his attorney. (Exhibit D).  This is evidence of attempts made by officers and staff to help Plaintiff  contact an attorney.  All of Plaintiff's allegations about not getting a "legal call forms" do not add up to actual injury, especially as attempts were made to contact attorneys at Plaintiff's request.

Plaintiff's allegations regarding access to the law library fail to establish that he suffered any actual injury.  While in the SHU Plaintiff requested and received law library services twenty three times between November 29, 2004 and February 5, 2005, the time periods he cites in his Complaint.  (Exhibits M and N).   While in SHU, Plaintiff had access to the law library seventy-seven times, between November 29, 2004 and August 1, 2005. During that time period, the average turn around time for requests was five days, not the "two months" he alleges in his Complaint.  (Statement of Claim #17), (Exhibit N).  In addition, Plaintiff's claim that "copys [sic] are 250 each" is simply not true. (Statement of Claim #17).   The practice of charging

inmates for copies ended on December 1, 2003. (Exhibit M ¶4). Further, Plaintiff did receive copies of case law. The case law is routinely copied for inmates in SHU. (Exhibit M ¶8). After leaving the SHU, Plaintiff was allowed access to the main law library at DCC. He had nineteen appointments at the law library in approximately two and a half months. He failed keep four of the appointments. (Exhibit O). Plaintiff had ample access to the law library. As the Supreme Court held in *Lewis*, more than vague allegations about the need for "information needed for my case" is required to state a claim for denial of access to the courts. Plaintiff provides no evidence that he suffered any actual injury due to issues of access to the law library at DCC. Plaintiff does not provide evidence that access to the law library was the reason why some of his motions and cases failed.[4] Therefore, Plaintiff's legal access claim must fail.[5]

## III.  PLAINTIFF'S ALLEGATIONS OF RETALIATION SHOW NO CAUSAL LINK BETWEEN EXERCISE OF A CONSTITUTIONAL RIGHT AND AN ADVERSE ACTION.

The Plaintiff's Complaint alleges that he has been attacked, but provides no specific information regarding any assaults. He merely gives a confusing recitation of allegations about other inmates and correction officers. (Statement of Claim, # 16). "Government actions, which standing alone do not violate the Constitution, may nevertheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *Allah v. Seiverling,* 229 F.3d 220, 224-25 (3d Cir. 2000)(citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 386 (6th Cir. 1999). A prisoner alleging violation of his Constitutional rights due to retaliation against him must show: (1) "the conduct which led to the alleged retaliation was constitutionally protected"; (2) "he suffered some 'adverse action' at the hands of the prison

---

[4] Plaintiff filed a Petition for Writ of mandamus demanding more time in the law library. (D.I. 25). In this document he lists cases and motions he *intends* to file, but does not provide evidence of actual injury.
[5] The very fact that these matters are being litigated serves to demonstrate the absence of actual injury in relation to Plaintiff's legal access claim. Plaintiff was clearly capable of accessing the District Court for the purposes of this litigation.

officials"; and (3) a causal link between the exercise of the constitutional right and the adverse action. *Rauser v. Horn,* 241 F.3d 330, 333 (3d Cir. 2001)(citations omitted).

A lack of any reports of assaults in his grievances, medical records or incident reports, records that would be generated in the event of an assault, is evidence that retaliatory assaults did not occur. Plaintiff has engaged in speculation in his Complaint regarding retaliation. He provides no specific information about any "intemidation" [sic]. (Statement of Claim, #16). His claim of verbal abuse regarding the razors is not evidence of retaliation. The SHU housing rules provide that inmates are to receive razors on certain days. Plaintiff certainly has a right to ask for a razor, and refusing to provide the razor on days when they are not distributed is not retaliation. It is an example of the housing rules being enforced in a way that Plaintiff did not like. It is also an example of how Plaintiff was treated the same as other inmates in the SHU. Shaving is not a constitutionally protected right. Plaintiff has failed to show how not receiving a razor is abusive, or that there is a link between that action and the exercise of a constitutional right.

A search of Plaintiff's records show only two incident reports for the time period after he filed this lawsuit. (Exhibit Q). Neither incident report concerns any assault. Shakedowns of inmate cells are a routine part of prison life and two shakedowns between the time he filed his complaint in February, 2005 and leaving the SHU in August, 2005 cannot form the basis of a retaliation claim. A review of Plaintiff's medical records fails to reveal any information regarding assaults on Plaintiff. A review of Plaintiff's grievances shows no complaints of assaults on Plaintiff, but numerous allegations of intimidation. (Exhibit H). Plaintiff's vague and wandering recitation of assaults on other inmates are not supported by any evidence and do not state a cause of action for *him* regarding retaliation. He provides absolutely no information

about any alleged assault on himself and unnamed inmates, thus failing to establish any claim for

retaliation.

## IV.    PLAINITFF HAS FAILED TO ALLEGE PHYSICAL INJURY AS REQUIRED BY THE PLRA.

The Prison Litigation Reform Act ("PLRA") mandates that an *in forma pauperis* plaintiff

demonstrate physical injury as a pre-requisite to recovery for any mental or emotional injury.  42

*U.S.C.* § 1997e(e), entitled "Limitation on recovery" states:

> No Federal civil action may be brought by a prisoner confined in a
> jail, prison, or other correctional facility, for mental or emotional
> injury suffered while in custody without a prior showing of
> physical injury.

The Third Circuit has interpreted § 1997e(e) to require more than *de minimis* injury.

> We believe that reading 1997e(e) to allow a plaintiff to allege any
> physical injury, no matter how minor, would produce an
> unintended (indeed absurd) result. Were we not to read 1997(e) as
> requiring more than a *de minimis* physical injury, we would turn its
> physical injury prerequisite into a mere pleading requirement,
> thereby rendering the requirement meaningless as a practical
> matter.

*Mitchell v. Horn,* 318 F.3d 523, 535 (3d Cir. 2003)(following the approach of the Fifth, Ninth,

and Eleventh Circuits that pursuant to § 1997e(e) a plaintiff must allege injury which is "less-

than-significant-but-more-than-*de minimis*. . ." <u>Id</u>.).

Plaintiff's Complaint alleges that "Due to the lack and denial of TVs Visits and telephone

calls games ect commissary and Reading Material has affected my Mental Condition" [sic].

(Statement of Claim, # 14).  Plaintiff goes on to claim that "The Lack of Privileges endangers my

sanity" [sic].  (Statement of Claim, # 14).  A review of Plaintiff's medical records shows that he

entered DCC with a history of depression. (Exhibit L). However, Plaintiff's complaint fails to

allege any physical injury of any kind.   Accordingly, Plaintiff's cause of action must be

dismissed for failure to comply with 42 *U.S.C.* § 1997e(e).

V.    THE ELEVENTH AMENDMENT IMMUNIZES DEFENDANTS FROM
      SUIT IN THEIR OFFICIAL CAPACITIES.

The Plaintiff's complaint arguably names the Defendants in their official capacities. The Eleventh Amendment provides that "the Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by Citizens or Subjects of any Foreign State." While the Amendment does not facially bar suits against the State by its citizens, the United States Supreme Court has held that in the absence of consent, a state is "immune from suits brought in federal courts by her own citizens as well as by citizens of another State." Edelman v. Jordan, 415 U.S. 651, 662-63 (1974).

The Eleventh Amendment stands "for the constitutional principle that State sovereign immunity limit[s] the federal courts' jurisdiction under Article III." Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54 (1996). "The Eleventh Amendment limits federal judicial power to entertain lawsuits against a State and, in the absence of congressional abrogation or consent, a suit against a state agency is proscribed." Neeley v. Samis, 183 F. Supp. 2d 672, 678 (D. Del. 2002) (quoting Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 98-100 (1984)). The United States Congress can abrogate a state's sovereign immunity, and therefore, its Eleventh Amendment immunity through the Fourteenth Amendment; however, only a clear indication of Congress' intent to waive the states' immunity will produce this result. Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996). No such clear intent can be seen in 42 U.S.C. §1983. In fact, a review of the statute demonstrates that Congress did not intend to waive the states' immunity. The statute facially allows suits only to be brought against "persons." 42 U.S.C. §1983. Neither the State of Delaware, nor agencies or officials of the State of Delaware are "persons" as contemplated by 42 U.S.C. § 1983.

17

A suit against state officials in their official capacities is treated as a suit against the State. Hafer v. Melo, 502 U.S. 21 (1991).  Under federal law, the Defendants in their official capacities are not "persons" for the purposes of 42 U.S.C. § 1983.  Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989).  Consequently, given this categorization, this Court lacks jurisdiction over the Defendants in their official capacities, and Defendants are outside the class of persons subject to liability under 42 U.S.C. § 1983.  Accordingly, any "official capacity" claims against Defendants should be dismissed based on the Eleventh Amendment to the United States Constitution.

## VI.     DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

The doctrine of qualified immunity protects government officials from civil liability insofar as their conduct "does not violate clearly established statutory or Constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity protects officials from the personal cost of litigation and the attendant inhibiting effect litigation has on the proper discharge of their official responsibilities. *Lee v. Mihalich*, 847 F.2d 66, 69 (3d Cir. 1988).

The Supreme Court has announced unequivocally that the District Court, at the earliest possible stage of litigation, must consider the defense of qualified immunity under a legal standard separate and apart from its analysis of the underlying claim itself.  These two analyses are not susceptible to fusion, and cannot be left for factual resolution by the trier of fact. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The first question before the Court in a qualified immunity analysis is whether, taken in the light most favorable to the party asserting injury, the facts show that the prison officials' conduct violated a constitutional right. *Brosseau v. Haugen, 125 S.Ct. 596, 598 (2004)(citing*

*Saucier v. Katz*, 533 U.S. 194, 201 (2001)). For the reasons set forth above, Plaintiff has failed to provide any evidentiary support to any of his alleged constitutional violations. In addition, Plaintiff's claims also suffer from several legal defects as set forth above. Plaintiff fails to make out a constitutional violation.

The next stage of the qualified immunity analysis requires the Court to ask whether the constitutional right allegedly violated was clearly established. *Saucier*, 533 U.S. at 201. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable prison official that his conduct was unlawful in the situation he confronted." *Id* at 202. The "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Court must ask whether a reasonable public official would know his or her *specific conduct* violated clearly established rights. *Grant v. City of Pittsburgh*, 98 F.3d 116, 121 (3d Cir. 1996). "The 'salient question' is whether the state of the law at the time of the challenged conduct gave defendants 'fair warning' that their action was unconstitutional. *Black Hawk v. Pennsylvania*, 225 F.Supp.2d 465, 480 (M.D. Pa. 2002)(*quoting Hope v. Pelzer*, 536 U.S. 730,741 (2002)(articulating the "clearly established" inquiry to require that an official have 'fair warning' that the alleged activity engaged in was unconstitutional)).

Plaintiff's claims are based on heretofore unrecognized legal rights based on chimerical guarantee of protection. Nothing in his Complaint or records supports a finding that any of the defendants ever engaged in any conduct which violated Plaintiff's rights. Additionally, Plaintiff's vague statements in his Complaint fail to allege how any Defendant's *specific conduct* violated his clearly established rights. Assuming *arguendo* Plaintiff's ability to support any violation of any constitutional right, there is no legal authority which would provide

the Defendants with "fair warning" that their alleged activities were unconstitutional. Accordingly, the Defendants are entitled to the defense of qualified immunity and summary judgment in their favor.

**VII.    DEFENDANTS ARE ENTITLED TO DISMISSAL BECAUSE THE PLAINTIFF'S COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.**

Though *pro se* pleadings are entitled to leniency, such pleadings must still place a defendant on notice as to what wrong he has supposedly committed. *Riley v. Jeffes*, 777 F.2d 143, 148 (3d Cir. 1985) ("[I]f a plaintiff presents only vague and conclusory allegations, the complaint should be dismissed."). *See also Solis v. Breslin*, 107 Fed.Appx. 262, 264 (2d Cir. 2004)(quoting *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 514 (2002)(affirming the District Court's dismissal of a *pro se* inmate's complaint because he had "not alleged the occurrence of any specific acts" which gave the defendants "fair notice" of what his claim was and "the grounds upon which they rest."). "Plaintiffs suing governmental officials in their individual capacities, . . . must allege specific conduct giving rise to a constitutional violation." *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002). "This standard requires more than conclusional assertions: The plaintiff must allege specific facts giving rise to a constitutional violation." *Id.* Although facts must be read in a light favorable to the non-moving party when considering a motion to dismiss or for summary judgment, there is no requirement to accept as true factual allegations that are vague and amorphous and thus cannot be proved.

A review of all of Plaintiff's pleadings from the first docket entry to present, provide no evidence of letters he said he wrote, and responses he received. The only evidence he provides are some grievances attached to docket item eight. Plaintiff has filed a Complaint, an Amended Complaint, motions for injunctive relief and temporary restraining orders, yet has never provided

20

any evidence to support any of his claims.   Therefore, Defendants are entitled to summary judgment.

## **CONCLUSION**

For the foregoing reasons, Defendants Carroll, Thomas, Gardels and Seacord respectfully requests that this Honorable Court enter an order dismissing Plaintiff's claims against them with prejudice.

**STATE OF DELAWARE**
**DEPARTMENT OF JUSTICE**

/s/ Lisa Barchi
Deputy Attorney General
820 N. French Street, 6th floor
Wilmington, DE 19801
(302) 577-8400
lisa.barchi@state.de.us

Date:  January 26, 2006                         Attorney for Defendants

## *CERTIFICATE OF MAILING AND/OR DELIVERY*

I hereby certify that on January 26, 2006, I electronically filed *Defendants' Memorandum of Point and Authorities in Support of Their Motion to Dismiss/Summary Judgment* with the Clerk of Court using CM/ECF.  I have mailed by United States Postal Service, the document to the following non-registered participant:

Monty Pepper
SBI # 156920
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

/s/ Lisa Barchi
Deputy Attorney General
820 N. French Street, 6th floor
Wilmington, DE 19801
(302) 577-8400
lisa.barchi@state.de.us

Attorney for State Defendant